Are you seated? Good afternoon, ladies and gentlemen. And as you can see, we have Judge Bybee by phone. Can you hear us, Judge Bybee? Okay. Proceed to have re-hearing en banc in the case of State of California et al. v. Azar. I'll hear from the United States. May it please the Court. Hashim Mupen for the Federal Government. I'll be presenting argument for 20 minutes on the statutory authority issues. And my colleague, Brinton Lucas, will spend 10 minutes on the APA and equity issues. And I'll reserve 5 minutes for rebuttal. HHS imposed certain requirements to ensure that abortion does not become a method of family planning in federally funded Title X programs. Nothing in either the appropriation rider's non-directive counseling requirement or the miscellaneous provision in Section 1554 of the Affordable Care Act prohibits the agency's exercise of its rulemaking authority, let alone with the clarity that is necessary to essentially strip HHS of authority that the Supreme Court has already held it possesses in Rust v. Sullivan, where it upheld even stricter restrictions than are at issue here today. If I could start with the non-directive counseling requirement and its application to the rules ban on abortion referrals. That provision does not violate the rider for two simple reasons. First, referral is not counseling. And second, not providing referral is not directive. And I'll address each of those points in turn. First, as to the distinction between referral and counseling, if you look through the briefs, the parties go back and forth with each side trying to point to statutes that either treat counseling and referral as different or treat counseling and referral as the same. And I would urge the Court to focus on the most directly relevant provisions to that question, which are the situations where either Congress or HHS itself tried to repeal the 1988 regulations that were at issue in Rust. So if, for example, you look at the 1992 and 1995 Family Planning Amendment Act, where Congress was specifically trying to overturn the result in Rust, you will see that what Congress did was they passed a language... Counsel, may I ask just sort of a preliminary question? In one of the three cases, counsel for the government conceded that if we consider a referral to be counseling, then you lose on this argument. Is that still your position? That's not, and I also don't think that that's quite a correct characterization of the statement below for two reasons. First, if you look at the transcript of that statement, what they're referring to is B-1 of the rule. That's the prenatal referral requirement. It's not referring to the ban on abortion referrals, which is in Subsection A of that provision. Also, I don't really think that was... But why is the government going to such great lengths to distinguish counseling from referrals if you don't think your argument depends on it, or bailing on that issue? We have two reasons why we're right, Your Honor. The statute at issue requires non-directive counseling, and our point is that this isn't counseling. It's referrals, and it's not directive. So we have two points. So if you... So just to be clear, though, from your position, I want to make sure I understand your position, which is that counseling does not include referrals, period, end of story? My point is that counseling and referral are two separate activities. Well, no, that's not my question. Does counseling include referral or not? So referrals can occur during counseling, but that does not mean they are one and the same. They are distinct activities. We know this from, as I was saying a moment ago, if you look at the 1992 and 1995 bills where Congress tried to rescind the rule at issue in Ross, Congress expressly said non-directive counseling and referrals. As Judge Wardlaw said, your brief goes very extensively into a difference between counseling and referrals, and I don't really understand. That's because they are very different. And if I can make the second point I was going to make, if you look at... Common sense suggests that when you go to a doctor and the doctor gives you advice, and if one part of that is going to be recommendations or a suggestion that you see somebody, they give you a referral. I'm not saying that a referral might not occur and it might not even occur at the end of counseling. I'm saying that they are legally different concepts. If you could look for example... Okay, so where do you pin referrals? I pin it in that it's a different concept. I've already pointed out... Which statutory provision or regulation do you then hook it to? I don't have to hook it to anything. It's their argument. What provides that clear distinction that you're trying to make? Right, so I've already talked about the 1992 and 1995 bills which draw that clear distinction. The other thing I will point you to is the 2000 regs, the regs that they want to go back to. If you look at those regs, they did two things that are quite relevant to your exact question. First, in rescinding the regulations in ROST, they said that non-directive counseling and referral requirements, they treated them as separate requirements. And if I point you to page 274... Counsel, the opposing brief equally refers to portions of regulations that talk about them as being integrated. So I guess what I'm trying to figure out is, is there any legal definition in the regs or anything that defines counseling or defines referrals? Or do we go back to just dictionary definitions? Or do we go back to how the AMA would treat counseling versus referrals? So I don't think that there's anything in the regs that provide a, here's a definition of counseling, here's a definition of referral. But what is quite important, as I was saying a second ago, the regs that they want to be in place, the 2000 regs, specifically, and on page 274, I think this is quite clear, if you look at page 274 of the 2000 regs, describes the referral context as being a separate context from the referral context and then says that there are separate requirements for one context and the other. I think that one of the problems with your argument, to me, on this one, is that you also in the new regs have a number of requirements as to what kinds of referrals can be made in the form of referrals and all of that. And that is discussed as part of the counseling session. Like, it's a whole one program that's together. And at the end of it, if during the counseling you say, and I hope I have this right, you can correct me if I have it wrong, if during the counseling the patient says, oh, well, I would like to talk with an abortion provider, there are certain things that you then say the Title X program operator can do. And that flows from and is part of that counseling session, right? Again, Your Honor, I'm not disputing that referrals might be the culmination of what happens at the end of counseling. That does not mean they're one and the same. Both the 1988 regs, the 2000 regs, and these regs all treat those as separate issues. They have separate sections in the rules that address what to do in counseling and what to do in referrals. But, look, even if you don't buy that distinction, let me turn to the second point, which is finish that if you want to, then I want to direct you to a different portion of the reg. So the second point is even if you read nondirective counseling to mean nondirective counseling plus referrals, that would just mean that any referral has to be nondirective. You couldn't have a directive referral. But what this rule does is prohibit abortion referrals. That's not directing anything. That is silence. Directing a referral would be saying you should go see this doctor rather than that doctor. But doesn't it also mandate referral to a prenatal center? So several points about that. You have two points on that. Okay. So the first point is that's a separate provision. So whatever you say about that provision, it doesn't answer what to do about the ban on abortion referrals. But even as to that provision, I think they're misunderstanding it for a couple of reasons. The first is they're treating that as a referral as one of the three. If there are three options of either having an abortion, giving up the child for adoption, or carrying the child and keeping it, they're treating the prenatal referral as a referral for the last option I just said, and that's just mistaken. The rule is quite clear that what the reason for that referral is because being pregnant is itself a medical condition that implicates the health and well-being of the woman while she is pregnant, wholly apart from whether she ends up deciding to go through any of those three options I just said. The rule explains that being pregnant can stress existing health conditions and create new health ones. And so the point of the rule is while the woman is pregnant, it is a medical situation, and that is why the referral is being given. So it's just wrong to say that. And why does it have the label prenatal? Natal suggests birth. So I don't disagree, Your Honor, but, again, take, for example, if you look at the 2,000 rules that they like. Those talked about referrals for prenatal care and delivery. Yes? Under the final rule, if a doctor is working for an entity that received Title X funds, was that the opinion that the patient's life would be seriously endangered if she continued her pregnancy? I guess I'm not on here. All right. Could she advise the patient of the alternative of an abortion in that situation? Yes, and I think that underscores the point I was giving a second ago, which is the statute here, 1008, bans abortion as a method of family planning. In the example you just gave, the abortion would not be as a method of family planning. It would be for the life of the mother. And so this rule makes clear that not only is it permitted, but it is, in fact, required to provide, for example, in a situation where there's an ectopic pregnancy, a referral for that. The prenatal referral that we've been talking about is similar to that. It's getting at a health condition that implicates the health of the woman wholly apart from whether the woman ends up deciding to get an abortion or not. And, again, it's important to remember, at the time the patient is in the Title X clinic, the Title X program doesn't know what she will end up doing. You know, whether to get an abortion or not is obviously a very difficult decision that people may change their minds about in both directions. And at the time that the woman is in the clinic, the one and only one thing that the doctor knows for sure is she is pregnant right then. Counsel, let me switch you to one of the words, two words that are actually defined. We've talked earlier with my colleagues about undefined terms. But the Congress defined the term non-directed counseling in the HHS Appropriation Act and Section 254C6A1 of the Public Health Service Act. Under the canon of statutory construction in terms of what legislative bodies mean, don't we have to give a consistent meaning to the word non-directed counseling in our decision regarding the final rule? So, again, I'll say a couple things. I don't disagree that you shouldn't interpret non-directed counseling differently here than elsewhere. I don't think they've pointed to a statute that says that non-directed counseling either encompasses referrals or requires providing counseling on every option as opposed to what the plain meaning of those words are, which is if you provide counseling on something, you must do it in a non-directed fashion. So from your perspective, yes, you agree that Congress has defined those terms. We need to apply it across the board. Do you just think when you read it, it doesn't change the argument against the government? Just to be clear, I'm not sure that anyone's pointed to a statute that, quote-unquote, defines the term non-directed counseling. Congress could do that, couldn't they? But they just haven't. They could do that, and then you wouldn't get to argue here today. They couldn't. They wouldn't get to argue here. More to the point, Congress repeatedly did try to rescind the 1988 rules, and when they did, they did exactly what you would think you would say when you were trying to do that. They didn't say all pregnancy counseling shall be non-directive. What they said was you must provide abortion counseling and abortion referral. That's what you would say if you were trying to rescind the 1988 rules. You would not say what the non-directive counseling rider says. What about, and I don't want you to let your time totally run before you discuss Section 1554, which, among other things, says, Secretary of HHS shall not promulgate any regulation that, and I'll just skip to Sub 3, interferes with communications regarding a full range of treatment options between the patient and provider. How does that square with your argument? So I think it's important to focus on the fact that this is a federally funded program, and the rules are what they are doing is limiting the scope of the program. When you understand that, you understand that this does not restrict or impede or create barriers or any of the other verbs that are in Section 1554, for the exact same reason that the Supreme Court in Russ v. Sullivan held that these rules did not abridge the freedom of speech or create an undue barrier to the abortion. I'm afraid I don't understand the answer. Is your answer that the regulation that's now at issue does not interfere with the communication regarding the full range of treatment? It does not, because what it does is constrain the scope of the program, but it leaves everyone who's outside the program free to act, and it even allows people who are within the program to engage in this behavior outside of the program. But it says any regulation. Right. It doesn't specify regulations outside of Title X. It just says any regulation. But if you read it that way, Your Honor, you would basically be reading 1554 to obliterate the government's ability to create limits on the scope of its own programs. So, for example, if a woman walked into a Title X clinic and said, By the way, doctor, I don't have a primary care physician. My knee is really hurting. Do you have any advice for me about what to do about my knee? And also, can you give me a referral to an orthopedist? On their plain text reading, well, that too would be restricting the information about a health care decision the patient's making. No one can plausibly read that statute. I have to say I disagree with you. The patient and the provider, providers have certain things that they do. So if I go to a brain specialist and I say I've got trouble with a rash on my face, I don't think that anyone would consider that brain surge to be a provider in that sense. We're going to a Title X provider, and the Title X provider, you can't interfere with communication regarding a full range of treatments. I don't think your knee example is consistent with the thrust of that statute. So I'll give two points in response to that. First, the plain text of 1554 doesn't draw the distinction you're drawing between which provider and another provider. It says restricting health care information. But second, even if I accept your distinction, I'll give you a different hypo. What if someone walks into a Title X clinic and says, Hey, I heard about this new type of contraception. I know it's not FDA approved. I would really like to know about that. And HHS said, Look, we don't want our Title X clinic providers to be giving information about non-FDA approved drugs. Wait a second. Didn't you just remove medically approved from these regulations as well? Isn't that another issue in this case? Now you're allowing the providers to give advice about non-FDA approved drugs. So I'll say two things. First, that is a separate challenge that they're complaining that we took out language that's not in this. No, the hypo does work because it's two separate points. I'm just addressing on your Honor's reading of 1554, it would prevent HHS from restricting communications to FDA approved drugs. That is just an utterly implausible reading of this statute. And the way you avoid that reading of the statute is you read the verbs the same way the Supreme Court interpreted the verbs in the Constitution to say it is not restricting or impeding or creating a barrier if you just limit the scope of the program to what the program is going to be and say you can do whatever you want outside of it. Judge Wardlaw, your point is that there's a separate statutory provision. I can't find any reason why medically approved was eliminated in that rule. Is there a reason? Yeah. Well, the two points. First, it's not in the statute. If you look at the statutory language, it says broad and effective range of services. And so all the agency has done is go back to the statutory language. I'm hard-pressed to understand how we could be sued for going back to the statutory language. And the reason they gave for doing that was they were worried that the language medically necessary was creating confusion. If I could reserve the balance of my time. Certainly. Thank you. May it please the Court. Brenton Lucas for the Federal Government. Plaintiffs' arbitrary and capricious claims essentially reduce to the assertion that the Secretary failed to account for a significant number of providers leaving the Title X program. That claim both impermissibly second-guesses the Secretary on the facts and on policy. I'd like to address each issue in turn. First, turning to the facts, I think the central point in plaintiffs' arbitrary and capricious claims is that this rule somehow requires them to violate medical ethics. That is not a new objection. The same arguments were pressed in Rust, and the Supreme Court evidently was not troubled by that. And I think the medical ethics argument is considerably less forceful here, given that the rule allows doctors to provide counseling on abortion, to inform women that abortion is an option, to discuss it. All that it does is it precludes them from giving abortion referrals. Going further on the medical ethics, if there was any doubt as if there's no violation, I would just look at the facts on the ground. If it was clear that there was a clear violation of medical ethics required under the rule, then you would expect to see a mass departure of providers from the program. But that hasn't happened. And I would just point you to... Counsel, let me touch to this question. For purposes of construing the development of this case, whatever the government may have thought at the time that the final rule was promulgated, are we allowed to take into account the number of people who, at least based on news reports, have in fact left Title X programs because of what they believe the requirements of Title X are? Can we take that into account at this point? Your Honor, I would just point you, first, as to what you can take into account, the predictions that the Secretary made and that they were reasonable. I'm just offering up these statistics as a way of confirming that the Secretary's predictions were reasonable. And, again, I want to be sure I understand your position. I know we can look at what he said at the time. The question I have is, as a matter of law, can we as an appellate court say, okay, this is what the Secretary thought at that point, based on whatever reports we could take into account, that prediction was incorrect. Can we take that into account? You look at the record that was before the Secretary at the time he made his decision and his explanation, and so that's what your review should be. I don't have to provide any details, but I'm happy to do so if this Court would be interested, because I do think it shows some light on the Secretary's predictions and why they were reasonable. And I would just point you to the fact that 18 grantees out of 90 have left the program, so that's 20 percent. If it was a clear violation of medical ethics, you would expect to see a much bigger withdrawal. You seem to think that the only reason why someone would leave the program is that it's a violation of medical ethics. The question is whether they're going to leave the program, not the reason why they might leave the program. Your Honor— Because the prediction of the Secretary says this will not seriously reduce the number of providers, and you're inserting because of a violation of medical ethics, but that's not part of the prediction. The prediction is, will they or will they not leave the program? Your Honor, I do not understand plaintiffs to say that they could just threaten to leave en masse for any reason whatsoever and the Secretary would have to accept their decision and conform to it. But it's not idle threats. It's a question of, is there some real reason that they do so? And we do know, and I'm not sure I shared Judge Smith's question, how much we can take this into consideration, but there has been, up until now, actually a fairly substantial departure. Your Honor, the reason—they can't just leave for any particular reason. Because the rule is not forcing them out. If it was actually requiring them to violate medical ethics, then they would have a claim. And I don't understand them to be saying that. Could you clarify one thing along this line? When were the current grants reaffirmed or taken? What's the status of the grant system right now? So the current grant system, grants were given out earlier this spring, and there will be— Before the current rule went into effect? Yes. So the new rule will come into—there will be a new grant cycle starting this fall with grants awarded next spring. I would just— And the new grants, the grantees will have to comply with the new rule. Yes, Your Honor. And I would point you to the fact— Let me ask you this. Can't the district court—so the district court granted a preliminary injunction, and part of the analysis was that there would be irreparable harm, correct? Can't the district court take a look at what happened afterwards? I mean, in the information that was provided to the district court about who might leave the program and who might, you know, those consequences, isn't that proper for the district court to take that into account, even though there's an administrative record where the secretary was making certain predictions? With respect to the equities, Your Honor, that's correct, but with respect to arbitrary and capricious, he was limited to the record review and from. But I will just point you to the fact that currently the secretary has opted for a supplemental grant application. These grants will be going out in the end of this month, ideally, and they'll be to current providers who are now going to compete for the funds that have been relinquished by the departing providers, so there will be a minimum gap in continuity. I would say we've received 53 grant applications asking for more money than we currently got back from the providers, so I think we will be able to easily redistribute the funds. So from the government's perspective, even if people have left the program, others have come in to take up the space, and so from a bottom line perspective, the monies are being used as Congress indicated and as the regulations have indicated, so it's a zero-sum game from your perspective. Exactly, Your Honor. I just want to stress that the federal government doesn't have an interest in ensuring that particular providers get the money. What the federal government has an interest in is ensuring that Title X funds go through and are used effectively, and so far, that is what has happened here, and I would just underscore, in fact, going back just to ethics and to underscore why this claim is not tenable, I just point you to Essential Access itself, who in their brief asserted that this would require them to violate medical ethics, but they're one of the providers that are still in the program. Now, turning on, I'd also like to just address physical separation briefly because that has also been raised, and again, this claim, the same arguments, the same rationales, the same decisions were addressed in Rust, and the Supreme Court upheld a functionally identical requirement for physical separation there, and so we don't think that the current judgment that some degree of physical separation is required can be dismissed as arbitrary and capricious. I note that plaintiffs state this. Do you feel that Rust controls in that regard? In other words, the Supreme Court said that that exact requirement was okay before, therefore, even though this regulation is supposed to take the place of the 2000 regulation, it's really the 1988 regulation that we should be focusing on because it's almost like it. Is that your position? Not quite, Your Honor. What I would say is that to the extent plaintiffs have not pointed to anything different  then we're hard-pressed to see how the Supreme Court's ruling would not control here. But just to be clear in case there's any confusion, the Secretary didn't say that he was just relying on the 1988 record. He had an extensive record before him, but he reached the same judgments as the Secretary did in 1988 when he promulgated the rule upheld by Rust. And also on the facts, I just want to underscore that the physical separation requirement and its effects on the program have been somewhat overblown by plaintiffs, so I would just point you to page 7781 of the preamble to this rule where the Secretary notes that based on current estimates, only 10 percent of Title X clinics are physically co-located with or provide abortion services, so it's not going to be a huge impact on the program. In addition, there's also a case-by-case analysis component of this, so the Secretary gave an example of a hospital. Perhaps there is an abortion clinic in one wing of the hospital as well as a family planning clinic wing in the other. That's obviously going to be taken into account, and so that, too, will cut down on the effects of this. And finally, even if they do separate, there may be low-cost ways of doing so. For example, a Title X grantee who has a number of different abortion clinics and Title X clinics can shift services between them without having to completely physically restructure each one. Now, I just also want to underscore the fact that even if providers leave this program, that doesn't necessarily mean they will close their doors or curtail services, and I would note that in the seven states that have withdrawn from the program, each of those states has promised to contribute their own state funding to keep those clinics open. Also, private providers have said that they are relying on private grants to keep open the doors for their clinics, and so Planned Parenthood of Utah has contributed to that. And so I just think it's very important that... Should that make any difference to our analysis of whether what the government has proposed here is lawful, the fact that third parties and states may be contributing in lieu of what the government proposes here? I think this is more towards the point of the equities, that the concerns about harm have been somewhat overblown, and that just to underscore the point that even if a clinic leaves the Title X program, that doesn't mean its doors will be shuttered. And so I just think that's very important to remember. And finally, even just as a pure point of law, setting all the harms aside, the Secretary made a hard decision, and he looked and said, look, even if there may be costs and disruption to this particular program, the costs are outweighed by the interest in complying with the statutory requirement that Title X funds don't go to programs where abortion is a method of family planning, as well as the separate... Was it recorded that there was a violation of the prohibition on funding for abortion? In terms of the evidence in the record is that there are co-locations of abortion sites with family planning. Were there any findings or evidence or showing that there were violations that were of concern to the Secretary? Your Honor, may I have leave to answer the question? I don't want to bleed into... Audits. Was there any evidence? I'd like to answer your question, but may I have leave to... No, please answer the question. Certainly, Your Honor. The evidence here is no one disputes that Title X clinics are co-located with abortion clinics or that Title X providers are referring for abortion. The only question is whether those are a problem. And the Secretary, engaging in the same analysis as in Rust, reasonably concluded that those would violate Title... There's no real evidence of that, though, in the record. The record is very clear that there is co-location of physical sites and abortion referrals. That's why we're here today. Thank you, Your Honor. Thank you, Counsel. May it please the Court? I'm Benjamin Guttman, appearing on behalf of the Appellees. We're here on a motion for a stay pending appeal, which means that the balance of hardships is at least as important as a preliminary review of the merits. We're here, at least I thought we were here, on the appeal from the injunction. Well, the Court has not, I don't think, been entirely clear. The only en banc petitions that I understand to have been granted were the petitions about the motion for a stay pending appeal. But we're certainly prepared to address the merits. My point is, regardless of whether we're talking about a preliminary injunction or a motion for a stay pending appeal, the balance of hardships is a crucial part of the equation. All three district courts here found that the rule will cause irreparable harm to plaintiffs, to vulnerable patients, and to the public health, and that at the same time the federal government will suffer no comparable harm. But I guess isn't it a hardship to the government if they can't implement a program that is constitutional? Well, that's the very question that we're here to address in this litigation. It's always easy when you're balancing hardships, when you see faces and you can attach it with people, but when you look at the government, if a government can never institute policies that are constitutional or legal that you can't run a government. So can't that be irreparable harm too? It can be when there's a particular need, but what we have here is preliminary injunctions that are just keeping in place the very same regulations that have governed the Title X program for decades. There's no need for any new rules to come into effect before they can be judicially reviewed. I guess the other argument would be on the other side, as administrations change, and those of us that have lived long enough to know that they do, environmental policies are different with new administrations, and that's part of, I guess, what they call elections have consequences, that people are able to, if it's constitutional, if it's legal, then they can change policies. And that's exactly, both sides here are arguing about what Congress intended with this program, and that is the merits question. But what the district courts all found is that the balance of hardships tip decidedly in plaintiffs' favor because, on the one hand, if the federal government is wrong here, there will be severe damage to public health, to vulnerable patients, to the plaintiffs. Perhaps I'm mistaken, but I think we're here on the merits. And so let's just pretend for a minute that's what we're doing. In public comments, the plaintiffs, and I'm speaking collectively, have characterized the final rule, which we'll call this, a gag rule with respect to abortion counseling. But the HHS recently said, and I'm quoting, the final rule does not include the 1988 regulations prohibition on counseling on abortion, characterized by some as a gag rule, but neither does it retain the mandate that all grantees must counsel on and refer for abortion. Is that an accurate statement of the final rule by HHS, and if not, what's erroneous about it? So the rule does allow abortion counseling, but only if the provider also talks about another option, even if the patient does not want to hear about another option. That is directive, and the rule bans any referral for abortion, while at the same time mandating a referral for prenatal care. All of that is directive because it slants the information that's being provided to the patient in favor of one option and against another option. I understand. So what you're saying is that the problem is that there's a relative tilting of the scale, if you will. Instead of being neutral or tilting it toward abortion, it's tilted toward non-abortion. Yeah, they can refer people for abortion under certain circumstances, but they can't give abortion advice there. Is that correct? Not exactly. They can't refer for abortion other than for an emergency medical need. But yes, the problem is that the playing field is tilted here. The information that's being provided is tilted, and that's not non-directive counseling. Non-directive counseling is a patient-driven. Your best argument is a statutory one, or it's based upon the meaning of the regulation. What's your best argument? I mean, my colleague had just pointed out if it's constitutional, maybe you have a problem. But is there something in the regulation itself that you think most clearly supports your position that there can't be a tilt based upon our discussion? Yes, that's what non-directive counseling means. So I'm referring to the appropriations rider that Congress has mandated that all counseling in the Title X program be non-directive. Evidence is there that Congress understood that all pregnancy counseling shall be non-directive language in the appropriation riders to require informing individuals of the availability of abortions. Because that's exactly what non-directive counseling has a defined meaning. Aren't we looking at what Congress understood those words to mean? Yes. So tell me what evidence there is that Congress understood it that way. So at the time that Congress first enacted that rider in 1996, the governing framework from HHS was its 1981 guidelines, which expressly said that non-directive counseling requires information about and a referral upon request for the options of continuing the pregnancy, adoption, and termination of the pregnancy. So those were the rules that were in place when Congress mandated non-directive counseling, and that's exactly how Congress would have understood the term. One of the amici briefs, or perhaps it was the government's brief, gives a legislated history around the appropriations rider, suggesting that that language was introduced as a compromise. I think I'm buzzing. Sorry about that. It was introduced as a compromise because some legislators wanted to eliminate Title X funding because of their concern about its use where abortion is used as a method of family planning. And so this rider, which says that no amount shall be expended for abortions, and then goes on to say, and that all pregnancy counseling shall be non-directive, was intended to get at ensuring that no funds would be used for abortion services or counseling. What's your response to that, or should we not even be looking at this context? So that's a misunderstanding, and I can point you to 141 Congressional Record H8250, which is the statement from Representative Greenwood, who was the sponsor of the rider that became the language that was enacted here, which specifically explained that counselors in these programs may not suggest that a client choose abortion, but lay out the legal options under the state laws that are applied. Now that's what Congress was voting on. There was a competing rider that would have essentially eliminated Title X entirely and just sent all the money in block grants to the states, and that was the one that was favored by some representatives who were concerned about abortion. That got voted down, and instead this one was enacted. And this one was essentially, again, the backdrop of this is that by 1996, the regulations that were at issue in Rust had already been suspended. The regulatory status quo was the 1981 guidelines, which required nondirective counseling on all options, including abortion, and that's exactly what Congress was essentially locking into law with this appropriations rider. And after the appropriations rider, how has the agency interpreted it? It has consistently interpreted it to require nondirective counseling on all options that are consistent with the client's expressed needs, and so including abortion. And that's been every year for the last 22 years or so when this rider has been reenacted. That's been the regulations that have been in place. And yet, counsel, what I struggle with is whether you agree with it as a matter of policy or not, the Hyde Amendment has been in effect for a long time, and that says you don't use federal money for abortion. So however one dances around this and we have to deal with the way these are drafted, the reality is unless the Hyde Amendment gets overruled or eliminated some way, you can't use federal money for abortion. What I hear you saying is that nondirective guidance, if you will, specifically includes using federal money for abortion services. Is that wrong? No, that's incorrect. No Title X money goes to support abortions, to provide abortions, anything of the sort. What we're talking about is counseling and a referral upon request. Can you explain just one argument is made that these rules were inconsistent with the federal conscience amendments which say that no one can be penalized for not referring for abortions. I guess the 2011, I believe it was, HHS published regulations saying that the current rules in Title X were inconsistent with the conscience amendments. At least that's the argument made by the government. Could you address that? Sure. Well, I mean, the most you would get out of the conscience amendments is potentially an exception for providers who object to giving counseling that includes, that potentially includes information about abortion. So they could opt out potentially of providing any counseling whatsoever. The prior rules require referrals for abortion. Upon request, correct. So you're saying that the conscience amendments provide a procedure for requesting an exception. Is that your reading of them? Is that how it's consistent? Well, to be clear here, I'm not conceding that that's actually what the conscience rules require, but I think that that's the most that you would get out of the conscience statutes, is an exception to the requirement to provide pregnancy counseling for somebody who objects to providing pregnancy counseling. It does not allow somebody to provide directive pregnancy counseling, and all it would do is allow somebody to opt out of If a person opted out and did not give referrals or counseling on abortion, would his counseling otherwise then be directive in your view? Yes, if the patient was interested in hearing about abortion, yes. Not if it was a patient who had already made a decision not to have an abortion. So an opt-out under the federal conscience rules would require a violation of the non-directive counseling? No. Is that what you're saying? No, I'm saying that if it applied here, it would potentially allow a provider to opt out of providing pregnancy counseling entirely. Not that it would allow a counselor to provide some pregnancy counseling, but in a directive way. So a Title X provider could not give any counseling at all if he or she objected to, had religious objections to advising on abortion. Is that what you're saying? They would be just out of the program? Not, I guess, maybe I'm not being clear. If an individual doctor has objection to providing non-directive pregnancy counseling that includes information about abortion, then the church amendments allow that individual doctor to opt out of participating in that part of the program. That does not exempt either the doctor or other provider or the clinic itself from ensuring that somebody else might be available to provide that service. That would really be a gag rule on that doctor because he couldn't give any advice at all under your interpretation. A doctor whose conscience prevented him or her from giving non-directive pregnancy counseling should not be providing non-directive pregnancy counseling. But they can't get Title X funds then. So what's the purpose of the conscience exception? I guess I'm trying to distinguish, and maybe not successfully, between the conscience of an individual doctor or other clinician and what a Title X provider as a whole might be doing. But it could be a whole Title X, that could be the whole Title X provider. Let's say, like, it's the Catholic Church getting Title X. And in that case, it may be that the whole provider would be providing a program that didn't involve pregnancy testing. But what the provider, what the conscience statutes do not allow is directive pregnancy counseling in violation of the appropriations rider. All it allows is an opt-out. It doesn't allow directive pregnancy counseling. Does that adequately explain what our understanding is? Counsel, I want to refer back to what you mentioned, the 92 bill that passed Congress, but it was vetoed by President Bush. That bill was very clear in saying that Title X funds could be used for non-directive counseling and referral for termination of pregnancy. Do you believe the 92 bill is more clear than the 96 appropriations rider with respect to whether Title X funds could be used for non-directive counseling and referral for termination of pregnancy? Well, it used more words, but I think the import was exactly the same. And there are a couple of things to draw from this legislative history. One is that after there was that effort to enact that statute in 92 and a similar effort in 1995, and then we got the appropriations rider in 1996, that's the end. There's no subsequent effort in Congress to enact something like the 1992 legislation, which I think suggests that people understood that the 1996 legislation had essentially accomplished that. And the other point is that the regulatory status quo was different in 1992 than it was in 1996. In 1992, the regulations, the rust regulations were still on the books, although there was ongoing litigation over whether they could be implemented. But by 1996, the status quo was the 1981 HHS guidelines, which provided for non-directive counseling, including information and referrals upon request about abortion. So the backdrop against which that was enacted was somewhat different. Thank you, counsel. Thank you. Thank you. I can't please the Court. Ruth Harlow on behalf of all plaintiffs at Belize. I'd like to start with three crucial points about plaintiffs' arbitrary rulemaking claims, claims which my colleagues from the Department of Justice have described far too narrowly, and claims that show plaintiffs' likelihood of success on the merits. First, the government on these claims is not holding HHS to the correct APA standards for reasoned rulemaking that the Supreme Court has spelled out in State Farm, Michigan v. EPA, and in CINO Motorcars. Each of the district courts did so. Second, agency decision-making is arbitrary when it creates a solution in search of a problem and does not reason rationally from the agency's evidence at hand to serve the overall public purpose of the program. Here, HHS irrationally prioritized layers upon layers of compliance burdens and its preferred reading of one section of the statute. Counsel, let me just interrupt your prepared part there, but one of the things that has troubled me about the position of the plaintiffs in this argument is here you've got rust. Admittedly, it's a different regulation, but the issues dealt with in rust are largely the same. There's some history, of course, involved in statute, but most of the big issues, for example, having a separate facility and so on, that was all dealt with by the Supreme Court in a similar kind of situation. Aren't we bound by what the Supreme Court said with respect to those big issues? Not the statutory construction of the new thing, but the bigger issues, like the First Amendment issues and the separate facility issue. Why would we be free to adopt a different conclusion or make a different conclusion here? Your Honor, no, you're not bound, and especially on the arbitrary and capricious claims. Those must be determined based on the administrative record that was before the agency in 2019, not in 1988 when they were considering a different rule, less onerous in its physical separation factors, which I'll describe, and in the interim, the agency has made specific findings, as Judge Chen stressed in 2000. They made specific findings that physical separation was unworkable, counterproductive, and unnecessary, and that, in fact, Title X's funding was strictly separate under the financial separation provisions. But with respect, Judge Chen's a wonderful judge and a terrific person, but the Supreme Court has said physical separation is just fine. Who are we supposed to follow? I realize the regulation is a little bit different, but the concept is very clear. The Supreme Court says this is okay. You can do that. The Supreme Court in 1991 was not deciding any issues about a rulemaking in 2019, and Encino Motor Cars is particularly important in this regard, Your Honor. When you're making a reversal in your regulatory policy, which there's no doubt the agency is here, it needs especially good reasons, and it needs to look at the facts before it in the administrative record at the time it's doing that and take into account why the previous regulation was in place, and that the agency has not done here. They have not rationally rested their determination on the record before them, and I can point to some specifics. And what about Rust? Didn't they have some influence? Doesn't that have some influence on the Secretary's analysis? Your Honor, not with regard to arbitrary and capricious rulemaking. You can see from Encino, and you can even see from Rust, which says the agency has to look at whether what it's doing makes sense in the context of the program it's implementing on an ongoing basis. They cannot justify the 2019 rulemaking as not arbitrary because in 1988 it made sense. I'm troubled by that because, admittedly, when the rule has changed, I get that, and one of my colleagues pointed out elections have consequences. All the time we go back and forth, back and forth with different regulations, slight changes, but different policy determinations. But when the Supreme Court has spoken about some of the very issues involved, I fail to see how we can, as part of the analysis of what is arbitrary and capricious, can ignore what the Supreme Court of the United States has said is okay. We're not asking you to ignore that, but the Supreme Court did not make any determinations about what was arbitrary or unreasoned in 2019. I understand that, but if they have found that a particular requirement of a previous regulation that's almost identical to this one was okay, isn't that part of the analysis that they would be having and determining whether it was arbitrary and capricious? The standard for arbitrary and capricious under State Farm, under Michigan versus EPA. You keep saying that, but that's a different issue, is it not? Well, let me just follow up because my question is similar because throughout the final rule, HHS relies on REST. And even REST itself said that if an agency is going to change position from a prior agency position, it has to give a reasoned explanation. And REST found that there was a reasoned explanation for the changes that went into effect in 1988. Why can't HHS at this point rely on REST as part of its reasoned explanation? Not as binding or controlling necessarily, but to formulate what a reasonable explanation... Why can't they say the Supreme Court said we could do those rules back in 1988 and maybe REST wouldn't bind us, but maybe it would go toward our analysis of whether or not HHS acted reasonably here. Well, Your Honor, I can point to some specifics that I think address that. In 1988, the agency relied on a GAO report and an OIG report of problems or lack of clarity in how the program was supposed to be operated. HHS has said now, no, we're not relying on that. They did not rely. They are not relying on the record in 1988 of why this might have been necessary then. Subsequent to that, the agency has issued very clear guidance on how to operate these programs so that the financial issues are completely separate and there is no funding of abortion-related activities. So they can't just go back and say it made sense because there was a problem then. We have to look at what's the history in the last 30 years and what is the effect on the program now. This is arbitrary and capricious because the costs it is imposing on the program far outweigh any benefits and because, as my colleagues have addressed, providers are departing from the program. They're not just departing because of ethical obligations. They are departing . . . So you're saying then that this is not a legal question. This is a factual question. Is that right? Yes, Your Honor. The arbitrary and capricious claims must be decided based on arguments from the factual record that was before the agency, the administrative record. And plaintiffs are likely to succeed on those claims, but the final resolution of those claims should be in the district court after a full examination of the agency's reasoning and the contents here of a very large administrative record. Do you agree that Rust is part of what they would have analyzed? Your Honor, we're not saying depart from Rust. We're not saying contradict Rust. But the arbitrary and capricious standards are in a different body of case law and require looking at what happened here. For example . . . Counsel, may I ask a procedural question? At this point, we have preliminary injunctions. What further proceedings do you anticipate in the district court? Do you think more factual development needs to take place? Your Honor, more factual presentation can take place. What we've done on the motions is all of the parties have used some of the comments from the administrative record, but the full record was not even produced by the time we did the preliminary injunctions. So we can supplement the comments we're relying on and we can make additional points about how the agency did not have anything to substantiate the rule in a reasoned way. But you're not suggesting that the court needs to consider anything outside the administrative record, are you? Your Honor, I think for irreparable harm, the court should consider some of the facts. But on the merits? Yes, but not on the merits, Your Honor. Counsel, did I just take you to suggest that we don't have the entire administrative record in front of us? No, Your Honor, you do not have the entire administrative record. It wasn't even produced until late June after the motions were adjudicated below. And again, the issues on stay and preliminary injunction are likelihood of success. Those are preliminary findings, which the plaintiff's arbitrary and capricious claims are much broader than the discussion so far has taken into account. The agency here assessed the financial and non-financial costs to the program in an arbitrary way. And the district courts have examined some of that evidence, but not all. And I do want to emphasize that these are different rules. Physical separation in 1988 didn't require new entrances and exits. It didn't require new electronic health record systems. And so when here in this rulemaking, HHS looked at physical separation, it pulled out of thin air a number of $30,000, which it said could fund each site separating. That is a far too low cost number when you look at the specifics given to the agency in comments, that the actual cost would be hundreds of thousands per site. And to see how off base that number is, if you take $30,000 and you think about just one new employee sitting at the new front desk in the new entrance, that the second duplicate facility is going to have, and one clinician to serve that facility, we're already talking multiples of $30,000. One of the points HHS made, or one of the arguments, was that these arguments about costs and cost saving actually supports its argument that the co-location of the facilities was using Title X funds to support the abortion services. What's your response to that? Your Honor, it does not support their argument. What we're focused on is the cost of running a Title X program, and whether any funds are being misused. In the current situation, Title X projects are already underfunded. They must raise money elsewhere. The regulations require that they get less than 100% of just doing the cost of their business. And now if the regulations increase their cost by saying we have to have completely separate facilities, we can't even be under the same roof as another facility, that's what we're saying is driving them out of the program. There's no transfer of money from Title X services to any abortion related service if they're simply under the same roof and may be having economies of scale. That is not the same thing as Title X funds going to abortion related activities. So the argument made is that money is fungible, and that if Title X funds are subsidizing, in effect, abortion services along with the Title X services, that is a violation of Section 1008. Are you saying that sort of subsidization does not occur? Yes, Your Honor, I'm saying that sort of subsidization does not occur. Title X funds are strictly regulated. Before they are dispersed, the grantee must tell the agency how it's going to use those funds, and then they are audited, they are subjected to compliance reviews, and all those funds are traced such that the agency knows where they are being spent. And that's why you don't see any evidence in the record of any problems with where this funding has gone over the last 20 years since. So I'm not understanding. Are you saying there's enough in the record for us to determine that there's an APA violation, that it's arbitrary and capricious, but there's not enough in the record for us to say it's not arbitrary and capricious? There's enough for you to win, but if you don't win, then it has to go back because the district court didn't actually get to that issue? Yes, Your Honor. All of the issues before the court right now are tentative. They are likelihood of success issues. And so regardless of what happens on this day in the preliminary injunction, we still have these claims in the district court. But I'd like to briefly turn to the harms that were described because from what the government said, you would not realize what is happening in the program, and this information can be taken into account in the balance of the hardships. As the government said, 20% of just 90 Title X grantees, 18 out of 90, have left completely. Five states no longer have any Title X program. The loss of grantees over 15 states means that more than 500 Title X service sites are no longer operating as Title X sites. No Planned Parenthood grantees or Planned Parenthood subrecipients are participating in Title X any longer, and that means that the sites that served roughly 40% of Title X patients in 2017 are no longer offering Title X services. And this is still unfolding. The deadlines have just passed for some of the compliance measures, but from the limited information we have, the Title X program has ended completely or now has network gaps in 28 states. Thank you, counsel. Mr. Mayor, can I just ask a quick housekeeping matter? Sure. Do we have the entire administrative record in front of us? I believe counsel was correct that the PIs were granted before the administrative record had been put in, so technically I think the record on the PI is without the administrative record. Okay. What do you mean when you say technically? You put out a qualifier. Yeah, sorry. It's correct. Okay. So I'd like to make four points, Your Honor. So does that have any significance for us? I don't think so, Your Honor. I think that is on the record. That's before you, which is the rule itself. We think that the district court plainly erred in finding that there was a likelihood of success on the merits or even saying that there was a serious question on the merits. I think we are clearly right on the record that exists, and that's enough to reverse the preliminary injunction that is before you. I do think at this point that it would be odd to treat this as just an en banc of the state decision as opposed to the underlying PI appeals. Everyone's briefed the merits and it would be sort of strange to have a merits panel. The merits of the preliminary injunction. Right. So on the merits, I think it's telling that my colleagues tried to start on the harms. They have a very hard merits case to be made because they have to essentially argue that Congress implicitly overturned Rust v. Sullivan, even though neither of the statutes they're invoking has any language that remotely resembles what you would say if you were trying to overturn Rust v. Sullivan. Instead, the 92 and 95 statutes did have the language you would do. On the non-directive counseling provision, I think the heart of our dispute comes down to this. They say that it is non-directive counseling if you don't provide all the options. That is just simply not what the phrase directive counseling means. Directive counseling means you can't say do one thing or the other. It doesn't say you have to give all the options or none. I think the easiest way to understand that is to look at the 2000 reg, the reg that they want. What the 2000 reg said was you shall give non-directive counseling on the following alternative courses of action, and then it lists the three. On their view, there was no need to say any of that. If non-directive counseling itself means you have to give counseling on all the options, you wouldn't bother spelling out the options that have to be given. It also just is consistent with just plain English. If you think, for example, of a school counselor who is giving advice about colleges, the fact that they might give advice about some colleges that are not others, or the fact that they might say, even if someone comes in and says I only want to know about one school, and they say I'm going to tell you about a bunch of schools, none of that is directive. What is directive is if you tell the person you should go to one school rather than the other. So to hear what is directive is if you tell the patient you should go with one option rather than the other. None of that means that the federal government can say that in this federally funded program, we're going to address certain options, not others, and particularly not where, and this is very important, they are allowed to provide abortion counseling. So they can provide all the counseling they want about abortion. The one thing they can't do is provide a referral. That's simply not directive. On the APA claims, I guess I'll say two very quick things, if Your Honor will indulge me. One, on Rust and the physical separation, the arguments they've made here today are the same exact arguments that were made in Rust. It's the same arguments that financial separation would be enough and that this is excessive and will cause people to leave. It's the same arguments that were made and with the same arguments that were rejected, and they haven't identified any meaningful difference. Last point is on ethics. They don't dispute that 80% of the Title X grantees are still in the program. On their theory, I suppose that means that 80% of Title X practitioners are putting their own medical licenses on the line to continue to remain in the program. That is simply not a plausible reading of what is happening here. What is instead plausible is that they recognize, as we argue, that nothing in medical ethics requires you when you're in a federally funded program not to restrict your advice and counseling to what the federal government pleads for. Thank you, Counselor. Thank you, Your Honor. The case that's heard will be submitted for decision and will be in court.
judges: Thomas, Leavy, Wardlaw, W. Fletcher, Paez, Bybee, Callahan, M. Smith, Jr., Ikuta, Miller, Lee